UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

STEPHEN PACE AND PALMINA PACE, a/k/a
PAM PACE,

                         Plaintiffs,

                                         08 Civ. 10996 (JSR)

        -against-

GEORGE B. SCHWARTZ,

                         Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

# PLAINTIFFS' MEMORANDUM OF LAW
# IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY
# INJUNCTION AND TEMPORARY RESTRAINING ORDER

**MALCOLM S. TAUB LLP**
*Attorneys for Plaintiffs Stephen Pace and Palmina Pace*
110 East 59th Street, 25th Floor
New York, New York 10022
(212) 265-8600
(212) 581-8958 Fax

# TABLE OF CONTENTS

PRELIMINARY STATEMENT…..………………………………………………...1

STATEMENT OF THE CASE…..………………………………………………3

PROCEDURAL HISTORY…..………………………………………………...10

ARGUMENT…..…………………………………………………………...11

    POINT I.    THE COURT SHOULD ENJOIN SALES OR TRANSFERS OF THE ARTWORK TO PRESERVE ITS ABILITY TO PROVIDE EFFECTIVE RELIEF AND AVOID IRREPARABLE HARM……..11

    POINT II.    PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT INJUNCTIVE RELIEF AND PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS, OR, AT THE VERY LEAST, THERE ARE SUFFICIENTLY SERIOUS QUESTIONS GOING TO THE MERITS, AND THAT THE BALANCE OF HARDSHIPS WEIGHS IN FAVOR OF PLAINTIFFS……………………………….......13

        A.    The Harm Is Irreparable…………………………………..13

        B.    Likelihood Of Success On The Merits………......…..........15

        C.    The Balance Of The Hardships Heavily Tips In Favor Of Pace…………………….............................................20

    POINT III.    A TEMPORARY RESTRAINING ORDER IS REQUIRED TO PROTECT PLAINTIFFS………………….....…………………20

    POINT IV.    LITTLE OR NO UNDERTAKING SHOULD BE REQUIRED…...21

CONCLUSION…..………………………………………………………….24

# TABLE OF AUTHORITIES

Cases:                                                                    Page(s)

Bray v. QFA Royalties LLC,
486 F. Supp. 2d 1237 (D. Colo. 2007) …………………………………………....11

Canadian Imp. Co. V. Cooper,
161 F. 279, 88 C.C.A. 325 (2d Cir. 1908) …………………………………………..16, 22

Dinner Club Corp. v. Hamlet on Olde Oyster Bay Homeowners Ass'n, Inc.,
21 A.D.3d 777, 801 N.Y.S.2d 25, 2005 N.Y. Slip Op. 06728……………………… ………12

Doctor's Associates, Inc. v. Distajo,
107 F.3d 126 (2d Cir. 1997) …………………………………………………………22

Echomail, Inc. v. American Express,
445 F.Supp.2d 87 (D.Mass 2006) …………………………………………………17, 23

Garcia v. Yonkers School Dist.,
561 F.3d 97, 242 Ed. Law Rep. 667 (2d Cir. 2009) …………………………………12

G.K. Alan Assoc., Inc. v. Lazzari
44 A.D.3d 95, 840 N.Y.S.2d 378, 2007 N.Y. Slip Op. 06019 (N.Y. App Div. 2007) …16, 23

Hirschfeld v. Margo Feiden Galleries, Ltd.,
2000 N.Y. Misc. LEXIS 663 (N.Y. Sup. Ct. 2000) …………………………..…………14, 16

Ideal Toy Corp. v. Sayco Doll  Corp.,
302 F.2d 623, 5 Fed.R.Serv.2d 1004, 133 U.S.P.Q. 104 (2d Cir. 1962) …………………..11

International Controls Corp. v. Vesco,
490 F.2d 1334 (2nd Cir. 1974) …………………………………………………………..22

Kerr S.S. Co. v. Kerr Nav.,
113 Misc. 56, 184 N.Y.S. 646 (N.Y. Cty. Sup. Ct. 1920) …………………………………16

LaForest v. Former Clean Air Holding Co., Inc.
376 F.3d 48 (2d Cir. 2004) …………………………………………………………..23

Moody v. Filipowski,
146 A.D.2d 675, 537 N.Y.S.2d 185 (NY App Div. 1989) …………………………………12

Cases:                                                                       Page(s)

Quinones v. Board of Managers of Regalwalk Condominium I,
242 A.D.2d 52, 673 N.Y.S.2d 450, 1998 N.Y. Slip Op. 05101 (NY App. Div. 2005) .......12

Sibbald v. Bethlehem Iron Co.,
83 N.Y. 378 (2d Cir. 1881) ...................................................................16, 22

Smith v. Conway,
198 Misc. 886, 101 N.Y.S.2d 529 (N.Y. Cty. Sup. Ct. 1950) .................................16

United States v. Adler's Creamery,
107 F.2d 987, 990 (2d Cir. 1939) ...........................................................11

Wesselmann v. International Images, Inc.,
259 AD2d 448, 687 N.Y.S.2d 339 (N.Y. App. Div. Dept 1999) ........................16, 17

Wesselmann v. International Images, Inc.,
 169 Misc.2d 476, 646 N.Y.S.2d 263 (Sup. Ct., N.Y. Co. 1996) ...............................15

Winter v. NRDC,
--U.S.--, 129 S.Ct. 365, 172 L.Ed.2d 249, 262 (2008)............................................15

Wright v. Giuliani,
230 F.3d 543, 11 A.D. Cases 1453, 19 NDLR P 123 (2d Cir. 2000) .........................12


Authorities                                                                  Page(s)

NEW YORK ARTS & CULTURAL AFFAIRS LAW §12.01..............................................15

NEW YORK ARTS & CULTURAL AFFAIRS LAW §12.01(A)(I) .....................................16

WARREN A. SEAVEY, HANDBOOK OF THE LAW OF AGENCY §46 (1964) .......................16

RESTATEMENT (SECOND) OF AGENCY §385 (2) .................................................17

RESTATEMENT (SECOND) OF AGENCY §386, CMT. F ILLUS. 3 (2006) ..........................17

RESTATEMENT (THIRD) OF AGENCY §3.10 (2006) ...............................................16

11A C. Wright et al., Federal Practice & Procedure § 2947, at 123 (2d ed. 1995) ............11

# PRELIMINARY STATEMENT

Plaintiffs submit this memorandum of law in support of Plaintiffs' motion for a temporary restraining order and preliminary injunction to preclude defendant George Schwartz from selling, gifting, transferring or encumbering any consigned pieces of artwork which were the subject of the parties Consignment Agreement during the pendency of this action. With the permission of this Court, Plaintiffs' incorporate by reference, all papers submitted in connection with their motion for Summary Judgment and in opposition to Defendant's motion for Summary Judgment and to dismiss various causes of action.[1]

A temporary Restraining Order and Preliminary Injunction are required to protect Plaintiffs. Defendant, as consignee, is Plaintiffs' agent and owes Plaintiffs a fiduciary duty. Nevertheless, Defendant is disposing of the consigned paintings in a manner which violates the parties' consignment agreement and breaches Defendant's fiduciary duty to Plaintiffs. As set forth in Plaintiffs' motion for summary judgment on their cause of action for Replevin, Plaintiffs have an absolute right to terminate the agency and to a return of the paintings. Plaintiffs desperately need the help of this Court to prevent Defendant from transferring or disposing of the consigned paintings in order to avoid returning them to Plaintiffs, as he is required to under law.

In the event this injunctive relief is denied, Plaintiffs will suffer irreparable harm. These paintings are unique (Plaintiffs' Ex. K p. 24) and represent a significant part of Stephen Pace's lifelong work. (Pace Aff. ¶36) A considerable portion of these are abstract expressionist works which were created in the early 1950s and weighted in the period of time when he produced significant abstract expressionist artworks. (Pace Aff. ¶36) Schwartz has commented that each

---

[1] All citations to the record correspond to the evidence submitted in connection with Plaintiffs' Opposition to Defendant's motion for summary judgment.

canvas remains so fresh in Stephen's mind, that he remembers its creation, its meaning, and his relationship to each canvas as if it were done yesterday. (Plaintiffs' Exhibit J). There is no way that money damages can satisfy the wrongs that have been committed by Schwartz in this action.

As set forth in Plaintiffs' moving papers, Plaintiffs are likely to succeed on the merits. When Plaintiffs consigned the paintings to Defendant, Defendant became Plaintiffs' agent with respect to the consigned works. Plaintiffs have the power to terminate that agency at any time, regardless of what the terms of the consignment agreement provide or any duration provided for in the consignment agreement. Specific performance is not an available remedy to the agent; he cannot compel continuation of the agency; and he cannot refuse to return possession of the consigned paintings. This is subject only to Plaintiffs' liability to respond to a claim for money damages for any out of pocket expenses resulting from any alleged breach.

The balancing of equities weighs heavily in favor of Plaintiffs. Defendant admits that he cannot attempt to exhibit or sell the paintings, *pendente lite*, due to the cloud of title resulting from this litigation. (Plaintiffs' Ex. D p. 135) Thus a temporary delay in sales or disposition cannot meaningfully harm him, and even if it did, it would be an injury compensable in damages (if proven). On the other hand, Plaintiffs, the owners of the paintings, stand to lose the product of Stephen's own creativity, an important sampling of his life's work; would lose the ability to control part of his artistic legacy; and the loss of unique and irreplaceable works. Defendant can be compensated by money; Plaintiffs cannot. Once Defendant wrongfully disposes of these paintings, they are gone forever.

In light of the foregoing, Plaintiffs motion must be granted.

# STATEMENT OF THE CASE

Stephen Pace is a 90 years old artist. His work was associated with that of artists such as Jackson Pollack, Mark Rothko, Willem de Kooning, Milton Avery and Franz Kline, with whom he was friendly and shared ideas. Stephen Pace was part of the movement. (Pace Aff. ¶ 3-4, 6)

Stephen's artwork is represented in notable collections, including those of the Whitney Museum of American Art in New York, the National Museum of American Art in Washington, D.C.; the National Academy of Design in New York, the Museum of Fine Art in Boston, the Hirschhorn Museum and Sculpture Garden in Washington, D.C., and the Curie Institute in Paris. Stephen was the subject of a documentary film known alternatively as "Maine Master" and "Stephen Pace: Indiana Painter," telecast by PBS. Defendant points out that Plaintiffs' net worth exceeds several millions of dollars. (Schwartz Affidavit, Ex. D). This is solely the result of the sale of Stephen's artwork and his standing in the art world. Stephen has taught as a Professor at American University in Washington D.C., The University of California at Berkeley, and the Pratt Institute in New York, just to name a few. There is no evidentiary basis for the statement that Stephen is an underappreciated artist, or that he somehow hoped George Schwartz would rescue him from this status. (Pace Aff. ¶ 3-4, 6)

Plaintiffs have donated significant amounts of money, property and significant amounts of artworks to various institutions. There is no issue as to Plaintiffs' ability to donate funds or artworks to institutions of their choice. (Pace Aff. ¶5)

Plaintiffs were introduced to Defendant by John Day. Prior to January 2007, Day was a school teacher in Maine and showed interest in Stephen's work. As the Defendant notes, prior to January 2007, while Stephen had been represented by galleries, there had never been a formal agreement. They operated on a "handshake" basis. Their agreements were based upon trust and

3

mutual respect. They all knew that the relationship could be terminated at any time and the terms could be changed at will by either of the parties. (Pace Aff. ¶7)

Stephen's discussions with Day merely involved the idea of associating him with galleries in different parts of the country in order to sell his work in other states. Day presented galleries to Plaintiffs which would sell Stephen's artwork. (Pace Aff.¶ 8; Ex C p. 56-59)

John Day also suggested that Plaintiffs meet George Schwartz who, he told Plaintiffs, had connections with significant galleries in California and that he would have Stephen's work placed in galleries there, where they could be sold. This was the beginning and end of the parties' understanding. (Pace Aff.¶ 9) Plaintiffs and Schwartz discussed the fact that, if it did not work out, Stephen's works would be returned to Plaintiffs. (Pace Aff. ¶9) This understanding was fully consistent with every other agreement that Plaintiffs had entered into, and fully consistent with Plaintiffs' understanding of Stephen's rights as an artist when he consigns works to a party who deals in art, despite the self-serving statements by Mr. Schwartz, Mr. Day and Mr. Schwartz's cousin to the contrary. (Pace Aff.¶ 9) Plaintiffs deny that Schwartz ever stated that they could not receive Stephen's paintings back, if they wanted them. (Pace Aff.¶ 9). It is inconceivable that Plaintiffs would entrust their works to someone whom they barely knew on an irrevocable basis. (Pace Aff.¶ 10).

The parties had a discussion over dinner and Plaintiffs were willing to give him the opportunity to sell Stephen's works in California. (Pace Aff.¶ 11). Plaintiffs had no intention that this arrangement would be exclusive, nor does the Agreement provide that it would be. (Pace Aff. ¶11) Schwartz regaled Plaintiffs with his desire to arrange for galleries to handle Stephen's work and other commercial exhibits where Stephen's artwork could be sold. (Pace Aff.¶ 11). Day and Schwartz told Plaintiffs that Schwartz spent a great deal of time dealing in

art, that he did so on a consistent basis, and that he had the ability to place Stephen's work in galleries where they would be sold. (Pace Aff.¶ 11).

Schwartz told Plaintiffs that Stephen's paintings would look beautiful on the large white walls of the Pacific coastal homes of purchasers in California and that once they were in galleries, his reputation on the West Coast would be enhanced (Pace Aff.¶ 12). On January 6, 2007, a day after the parties' dinner, Schwartz appeared at Stephen's studio with Day and Schwartz's cousin, Linda Kligman. Schwartz then presented a Consignment Agreement which Schwartz had drafted. (Pace Aff.¶ 12, Ex B; Ex. D pp. 191-192, 200, 237-238, 244-245)

The Agreement was fully consistent with the parties' understanding that Schwartz would sell the paintings in California and would do so through commercial exhibitions, which clearly meant gallery representation. (Pace Aff.¶ 12). Day has acknowledged in his deposition that there were discussions about galleries and the sale of Stephen's artwork through galleries. (Plaintiffs' Ex C. pp. 87, 125-126). The parties discussed prices for the artwork, which Plaintiffs understood were the minimum prices, and that Plaintiffs would receive half of the profits above that price. Pace Aff.¶ 12. Day's testimony also confirmed discussions between Schwartz and Plaintiffs, whereby it was agreed that Plaintiffs would share in the proceeds which were obtained from the galleries. (Plaintiffs' Ex C. pp. 125- 126; Pace Aff.¶ 13).

Defendant makes reference to a Guardianship Petition filed against the Paces. That Petition was brought by a former attorney, Stephanie Ressler, which may have excluded her from controlling their estates and the commissions attendant to that position. (Pace Aff. ¶14).

There is quite a difference between being declared competent for the purpose of a Guardian Petition and having the acumen to enter into and comprehend business transactions. (Pace Aff. ¶15) At the time Stephen Pace signed these agreements, his wife who, as the

Evaluator admits, previously handled all of Stephen's business dealings, (Schwartz Aff. Exhibit E ¶34) was entering into the depths of dementia or Alzheimer's disease. (Pace Aff. ¶16)

The structure as outlined by Schwartz in his moving papers is designed to benefit only two people, Schwartz and Day. It would take years for him to organize a museum show. Then, and only then, would Defendant have Stephen's work placed in galleries. (Plaintiffs' Ex. D pp.147). There is no reference to this procedure in their Agreement. Rather than placing the work in galleries, Stephen's works were placed in Defendant's private office. (Plaintiffs' Ex. D pp.119) He did not place Stephen's artwork for "commercial exhibitions" anywhere on this planet until after this litigation was commenced. (Pace Aff. ¶18)  He then placed a limited number of works in galleries in Maine, which competed with the galleries which Stephen himself had chosen to deal with in Maine. (Pace Aff. ¶18)

On March 5, 2007, Schwartz and Day appeared in Stephen's studio, and they asked for permission to donate three additional paintings to museums in California. (Pace Aff. ¶20) Stephen does not recall their having called him prior to this meeting, and although he doesn't have a specific recollection of this agreement, he concedes that it is possible he agreed to have his work donated to the California museums. (Pace Aff. ¶20)  That amendment provides that Stephen and Pam Pace "irrevocably authorize George B. Schwartz to use his discretion to donate" three specific paintings to "institutions and/or museums in California." (Plaintiffs' Ex E)

On August 22, 2007, Schwartz and Day again appeared unannounced at the Paces' home. (Pace Aff. ¶21)  Plaintiffs were then presented with another written agreement. (Pace Aff. ¶21) Stephen does not have a specific recollection of the terms of this agreement.  (Pace Aff. ¶21)  He was not represented by counsel.  Stephen doesn't believe that the terms of the agreement were ever explained to him. (Pace Aff. ¶21) If anything, they may have said that they needed

something in writing to help with the sale of his paintings. (Pace Aff. ¶21) The second amendment allows Schwartz to donate any other consigned painting as substitutes for the three paintings mentioned in the March 6, 2007 agreement. It also states that the "restrictions that the paintings be sold in California or donated to California museums" are removed. (Plaintiffs' Ex F)

The "major reason" the second amendment to the Consignment Agreement was presented to Plaintiffs to sign was to permit John Day to "purchase" certain consigned paintings in Maine. (Plaintiffs' Ex.C pp126-128; Plaintiffs' Ex. D pp.244-245, 252, 265)  John Day testified:

> "Well, I had always said that like the question of what is the definition of "is" is, what's the definition of "in" because does this mean they have to be sold in California, that region or in California to Des Moines or to Ft. Lauderdale so George had said it's nebulous, let's clear that up and so the restriction that the paintings be sold in California or at any California museums are removed was pretty forthright."     (Plaintiffs' Ex. C pg. 127)

Plaintiffs never understood that they were giving Schwartz the right to sell his artwork outside of the state of California (Pace Aff. ¶21), much less in Maine, where he was already represented.

By this time Schwartz and Day were contriving to have Schwartz give paintings to Day. Schwartz and Day were concerned that their initial agreement, which provided for sales in California, might preclude them from dealing with Day in Maine or donating paintings in Day's name to the Fryeburg Academy in Maine.

Although Day introduced Schwartz to the Paces as someone who would place Stephen's artworks in galleries in California and on the west coast, he was hoping to acquire the consigned paintings for himself so that they would remain in Maine. (Plaintiffs' Ex. C pp.17-18, 20-21; Plaintiffs'Ex. D. pp.254) Schwartz and Day's purpose for the second amendment was to permit Schwartz to provide Day with Stephen's paintings. (Plaintiffs' Ex. C pp. 126-128; Plaintiffs' Ex. D pp. 244-245, 252, 265)

The amendment of August 22, 2007, was executed in order to bestow further largesse upon Day and had nothing to do with the commercial exhibitions of Pace's works. As of this date, Stephen had already donated both artworks and monies to the Fryeburg Academy, a high school in Maine, which Day attended, and was now acting as head of the Pamela F. and Stephen F. Pace Galleries of Art. Plaintiffs have now learned that Schwartz has loaned 11 of the consigned paintings for an Exhibition at the Fryeburg Academy. (Pace Aff. ¶26) Stephen did not need either Schwartz or Day to arrange for his paintings to be exhibited at the Fryeburg Academy in a gallery that bears his name and that of his wife. These exhibits are not commercial exhibits as contemplated by the parties' Agreement, and have nothing to do with the sale of Stephen's paintings. They are merely another breach of that Agreement.

Day now admits that he has received nine (9) of Stephen's paintings from Schwartz. Other than a trade of one painting to Schwartz, neither Schwartz, nor Day can recall what, if anything, Day paid for the paintings given to him by Schwartz. (Plaintiffs' Ex. C. pp 16-32; Plaintiffs' Ex. D. pp 250-251).

Schwartz also executed gift documents in connection with the donation of consigned paintings, listing himself as the "Donor" of these consigned paintings. (Plaintiffs' Ex. G). By listing himself as the "Donor" without disclosing that he was merely a consignee of the work, he attempted to portray himself as the owner of the artwork. Defendant received the prestige and goodwill accompanying the donation. Not only did Defendant list himself as the Donor of these artworks, he also designated that the painting was "Gifted in Honor of John M. Day". (Plaintiffs' Ex. G). He then failed to notify Plaintiffs of these donations for four (4) months. (Pace Aff. ¶28)

Schwartz contacted a gallery to which Stephen had consigned other Pace artworks for sale. Schwartz represented himself as the owner of the paintings consigned to him and offered to

trade certain of the artworks consigned to him for other Paintings, which were in the gallery in Maine. In other words, Schwartz offered to trade artwork which Stephen owns, in exchange for other artwork which Stephen owns. (Pace Aff. ¶30)

Schwartz e-mailed the owner of the gallery and suggested that she contact Stephen in an effort to lower the price that she could obtain Stephen's artworks for, so that she could in turn afford to trade his artwork for other artwork of his which was merely consigned to Schwartz. (Pace Aff. ¶31). He used the consigned paintings in order to attempt to obtain other artworks which he preferred to own, even if he would have Ms. Wilkes negotiate against Stephen to reduce their agreed prices so that Schwartz could receive the benefit of that transaction.

Schwartz has now admitted at his deposition that he never had any business relationship with any gallery in California prior to the time the Consignment Agreement was executed. (Plaintiffs' Ex. D. pp. 128-130)

What is undisputed is that prior to this lawsuit, Schwartz did not place Stephen's works in galleries for commercial exhibitions, as required by their agreement, nor did he have the ability to do so. (Plaintiffs' Ex. D. pp. 128-130) There is no basis to conclude that this was an exclusive Consignment Agreement. Schwartz's only obligation was to pay for shipping to California if and when he chose to have the Pace artworks shipped. Moreover, he has spent no money on storage, since he is hanging the paintings in his own office. (Plaintiffs' Ex. D. pp. 119) It is evident from a letter submitted by Schwartz's Counsel that the Consignment Agreement and any Amendments thereto "impose no obligation on Mr. Schwartz regarding promotional efforts, donees, gallery exhibits or accounting." (Plaintiffs' Ex. I)

Defendant has tried to minimize his wrongful acts by claiming that the consigned paintings were merely the "leftovers" from what other institutions and galleries had chosen to

select for donation or consignment, or that these works were not significant when viewed in the context of Stephen's entire body of work.

In fact, prior to the execution of the Consignment Agreement, Plaintiffs donated no more than five (5) paintings to the University of Southern Indiana, approximately fifteen (15) paintings to the Fryeburg Academy. At that time, no paintings had been donated to the Maine College of Art; Perlow Gallery had not selected paintings for its Abstract Expressionist show; and the Paces had consigned less than twenty (20) artworks to Acme Gallery. Plaintiffs had no relationship with Courthouse Gallery until after January 6, 2007. (Pace Aff. ¶35)

Finally, each and every one of these artworks is unique in nature. Schwartz has commented that each canvas remains so fresh in Stephen's mind, that he remembers its creation, its meaning, and his relationship to each canvas as if it were done yesterday. (Plaintiffs' Exhibit J). These paintings represent a significant part of Stephen Pace's lifelong work. A considerable portion of these are abstract expressionist works which were created in the early 1950s and weighted in the period of time when he produced significant abstract expressionist artworks. (Pace Aff. ¶36) There is no way that money damages can satisfy the wrongs that have been committed by Schwartz in this action. Defendant's own expert admits that each artwork is unique. (Plaintiffs' Ex. K p. 24).

## PROCEDURAL HISTORY

Plaintiffs filed a complaint in seven counts. By order filed April 14, 2009, the Court dismissed the first, third and seventh counts, alleging fraud, lack of consideration and unconscionability. The Court denied Defendant's motion to dismiss the remaining counts, including the fourth count, for replevin, and the fifth count, for injunctive relief.

The Court gave permission to file this motion in a telephone conference.  The motion is returnable at the same time as pending dispositive motions previously filed by the parties – Pace's motion for summary judgment on the replevin count, directing Schwartz to return the paintings to Pace, and Schwartz's motion for summary judgment on Plaintiffs' cause of action for replevin and to dismiss Plaintiffs' cause of action for an injunction.  Because those motions involve many of the same facts as this motion, and to avoid repetitive filings with this Court, Pace will rely upon and respectfully refers to his papers on those motions in further support of this application.

## ARGUMENT

### POINT I

### THE COURT SHOULD ENJOIN SALES OR TRANSFERS OF THE ARTWORK TO PRESERVE ITS ABILITY TO PROVIDE EFFECTIVE RELIEF AND AVOID IRREPARABLE HARM.

"The purpose of a preliminary injunction pendente lite is to guard against a change in conditions which will hamper or prevent the granting of such relief as may be found proper after the trial of the issues."  United States v. Adler's Creamery, 107 F.2d 987, 990 (2d Cir. 1939).

"The 'paramount purpose' of preliminary injunctive relief is to assure that the nonmovant does not take unilateral action which would prevent the court from providing effective relief to the movant should he ultimately prevail on the merits." Bray v. QFA Royalties LLC, 486 F. Supp. 2d 1237 (D. Colo. 2007) (citations omitted); 11A C. Wright et al., Federal Practice & Procedure § 2947, at 123 (2d ed. 1995).  Hence, a preliminary injunction will be granted to preserve the status quo pending litigation.   Ideal Toy Corp. v. Sayco Doll Corp.,

302 F.2d 623, 5 Fed.R.Serv.2d 1004, 133 U.S.P.Q. 104 (2d Cir. 1962). By the same principles, a temporary restraining order ("TRO") will be granted where needed to preserve an existing situation in status quo until the court has an opportunity to pass upon the merits of the demand for a preliminary injunction. Garcia v. Yonkers School Dist., 561 F.3d 97, 242 Ed. Law Rep. 667 (2d Cir. 2009)

A preliminary injunction may be granted when the party seeking the injunction establishes that "1) absent injunctive relief, it will suffer irreparable harm, and 2) either a) that it is likely to succeed on the merits, or b) that there are sufficiently serious questions going to the merits to make them a fair ground for litigation, and that the balance of hardships tips decidedly in favor of the moving party." Wright v. Giuliani, 230 F.3d 543, 11 A.D. Cases 1453, 19 NDLR P 123 (2d Cir. 2000); Otokoyama Co. Ltd. v. Wine of Japan Import, Inc., 175 F.3d 266, 270 (2d Cir.1999).

Under New York law, which provides the rule of decision on the substantive claims, preliminary injunctions are also authorized "in any action where the plaintiff has demanded and would be entitled to a judgment restraining the defendant from the commission or continuance of an act, which, if committed or continued during the pendency of the action, would produce injury to the plaintiff". Moody v. Filipowski, 146 A.D.2d 675, 537 N.Y.S.2d 185 (NY App Div. 1989); Quinones v. Board of Managers of Regalwalk Condominium I, 242 A.D.2d 52, 673 N.Y.S.2d 450, 1998 N.Y. Slip Op. 05101 (NY App. Div. 2005); Dinner Club Corp. v. Hamlet on Olde Oyster Bay Homeowners Ass'n, Inc., 21 A.D.3d 777, 801 N.Y.S.2d 25, 2005 N.Y. Slip Op. 06728 (citing CPLR 6301).

Plaintiffs have met these standards.

**POINT II**

**PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT INJUNCTIVE RELIEF
AND PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS, OR, AT THE
VERY LEAST, THERE ARE SUFFICIENTLY SERIOUS QUESTIONS GOING TO THE
MERITS, AND THAT THE BALANCE OF HARDSHIPS WEIGHS IN FAVOR OF
PLAINTIFFS**

A.  The Harm Is Irreparable

Plaintiffs have established that they will suffer irreparable harm absent the granting of an injunction. Defendant admits, and Day acknowledges, that, rather than selling the paintings, as was his responsibility under the Consignment Agreement, he has been giving the paintings to John Day.

Plaintiffs have now learned that Schwartz has loaned 11 of the consigned paintings for an Exhibition at the Fryeburg Academy. (Pace Aff. ¶26) Stephen did not need either Schwartz or Day to arrange for his paintings to be exhibited at the Fryeburg Academy in a gallery that bears his name and that of his wife. These exhibits are not commercial exhibits as contemplated by the parties' Agreement, and have nothing to do with the sale of Stephen's paintings. They are merely another breach of that Agreement.

Approximately nine consigned paintings were traded or sold to John Day. (Exhibit J pp.277; Exhibit L) Neither Day, nor Schwartz could recall the precise date of the trades or sales, nor the consideration for the trades. (Exhibit H pp.16-32; Exhibit J pp.250-261; Exhibit L). Schwartz does not have any documents which would identify the precise date of the trades or sales, nor the consideration for the trades or sales. (Exhibit J pp. 251)

Schwartz also executed gift documents in connection with the donation of consigned paintings, listing himself as the "Donor" of these consigned paintings. (Plaintiffs' Ex. G)  By

listing himself as the "Donor" without disclosing that he was merely a consignee of the work, he attempted to portray himself as the owner of the artwork. Defendant received the prestige and goodwill accompanying the donation. Not only did Defendant list himself as the Donor of these artworks, he also designated that the painting was "Gifted in Honor of John M. Day". (Plaintiffs' Ex. G). He then failed to notify Plaintiffs of these donations for four (4) months. (Pace Aff. ¶28)

Schwartz also contacted a gallery to which Stephen had consigned other Pace artworks for sale. Schwartz represented himself as the owner of the paintings consigned to him and offered to trade certain of the artworks consigned to him for other Paintings, which were in the gallery in Maine. In other words, Schwartz offered to trade artwork which Stephen owns, in exchange for other artwork which Stephen owns. (Pace Aff. ¶30)

Schwartz e-mailed the owner of the gallery and suggested that she contact Stephen in an effort to lower the price that she could obtain Stephen's artworks for, so that she could in turn afford to trade his artwork for other artwork of his which was merely consigned to Schwartz. (Pace Aff. ¶31). He used the consigned paintings in order to attempt to obtain other artworks which he preferred to own, even if he would have Ms. Wilkes negotiate against Stephen to reduce their agreed prices so that Schwartz could receive the benefit of that transaction.

To be irreparable, of course, an injury must be of a type for which money damages would not be an adequate remedy. However, courts have repeatedly recognized that monetary damages are inadequate to remedy the loss of original works of art. See, e.g., Hirschfeld v. Margo Feiden Galleries, Ltd., 2000 N.Y.Misc. LEXIS 663 at *7 (N.Y.Sup.Ct., July 26, 2000). Defendant and his expert, moreover, have conceded that the artwork is unique and irreplaceable. (Plaintiffs' Ex. K p. 24). Thus, if the status quo is temporarily preserved by precluding transfers or disposition, Schwartz would merely be temporarily denied money – and an inappropriate windfall at that --

while Pace would lose his artwork, which has tremendous personal significance to him – indeed, they are part of his artistic legacy – and once the paintings are gone, they are gone.

Additionally, as demonstrated in the pending summary judgment motions, Schwartz's authority to act as Pace's agent has been terminated – whether by reason of Schwartz's breaches of the agreements, his violations of his fiduciary duties, or by the simple fact that Pace has revoked his agency and demanded return of the artwork. Thus, in <u>Wesselmann v. International Images, Inc.</u>, 169 Misc.2d 476, 646 N.Y.S.2d 263 (Sup.Ct., N.Y. Co. 1996), the court granted a preliminary injunction, directing turnover of the artworks to an independent third party, on a showing that the arrangement was a likely a consignment, such that the artwork constituted "trust property" within the meaning of N.Y. Arts & Cultural Affairs Law Section 12.01; the consignee had removed the art from the state, and was continuing to sell it without accounting for proceeds. In those circumstances, as here, if the consignee continued to this "… it would render ineffectual [any] judgment compelling the return of the Art."

It should be emphasized that Plaintiffs have not shown merely a possibility of these injuries; rather, since the past violations of the consignment are blatant and essentially uncontested, Plaintiffs have demonstrated clearly that irreparable injury is likely in the absence of an injunction. <u>Winter v. NRDC</u> --U.S.--, 129 S.Ct. 365, 172 L.Ed.2d 249, 262 (2008).

B. <u>Likelihood Of Success On The Merits</u>

Plaintiffs are likely to succeed on the merits. Plaintiffs refer to their motion for Summary Judgment for a full rendering of the applicable facts and law of this case. As more fully set forth in Plaintiffs' motion for Summary Judgment, Schwartz as consignee, is the agent for Plaintiffs. An agent only serves at the behest and pleasure of the principal. The law is crystal clear that a

principal has the absolute and unrestricted right to terminate his agent's authority and to a return the principal's property. This right exists even where an agreement provides a set duration for the agency relationship. This right exists in spite of any promise not to do so. These rights are subject only to a principal's liability to respond in damages for breach of his contract.

When Plaintiffs consigned the paintings to Defendant, Defendant became Plaintiffs' agent with respect to the consigned works. See NY ART & CULT AFF §12.01(a)(i); Wesselmann v. International Images, Inc., 259 A.D.2d 448, 687 N.Y.S.2d 339 (N.Y. App. Div. Dep't 1999); Hirschfeld v. Margo Feiden Galleries, Ltd., 2000 N.Y. Misc. LEXIS 663 (N.Y. Sup. Ct. 2000). Plaintiffs have the power to terminate that agency at any time, regardless of what the terms of the consignment agreement provide. Canadian Imp. Co. V. Cooper, 161 F. 279, 88 C.C.A. 325 (2d Cir. 1908); Sibbald v. Bethlehem Iron Co., 83 N.Y. 378 (2d Cir. 1881). See also, G.K. Alan Assoc., Inc. v. Lazzari 44 A.D.3d 95, 840 N.Y.S.2d 378, 2007 N.Y. Slip Op. 06019 (N.Y. App Div. 2007.) This is true even where a consignment agreement provides a specific duration for the agency relationship -- the principal nevertheless retains the power to terminate the agency and recover his property at any time. Kerr S.S. Co. v. Kerr Nav., 113 Misc. 56, 184 N.Y.S. 646 (N.Y. Cty. Sup. Ct. 1920) Smith v. Conway, 198 Misc. 886, 101 N.Y.S.2d 529 (N.Y. Cty. Sup. Ct. 1950) (*holding* a principal is permitted to revoke an agency when he pleases, even though he has contracted with the agent for a definite period of time, for the reason that it is deemed contrary to public policy for a principal to have an agent forced upon him against his will); See also WARREN A. SEAVEY, HANDBOOK OF THE LAW OF AGENCY §46 (1964) ("The principal can revoke the authority of an agent at any time, irrespective of an agreement not to do so"); RESTATEMENT (THIRD) OF AGENCY §3.10 (2006).

The power to revoke the agency carries with it the agent's obligation to return the principal's property. See Echomail, Inc. v. American Express, 445 F.Supp.2d 87 (D.Mass 2006). (*holding* that consigned property had to be returned, notwithstanding claim that the agent had incurred substantial costs related to performing the agency); See also Wesselmann v. Int'l Images, Inc., 259 A.D.2d 448, 687 N.Y.S.2d 339 (1st Dep't 1999)

Here, Plaintiffs have unequivocally demanded return of the paintings and have manifested a clear intent to terminate the agency relationship and Defendant's authority to dispose of the consigned paintings in any way. As their (former) agent, Schwartz must follow Plaintiffs' instructions as to how the art is to be handled. See RESTATEMENT (SECOND) OF AGENCY §386, CMT. F ILLUS. 3 (2006) " (the agent may retain principal's property after termination of agency only to protect the principal's interests pending instructions) but conversely, where, as here, the principal has given instructions as to disposition of the property, the agent must obey the principal's instructions. That the agent disagrees with those instructions is immaterial – "Unless he is privileged to protect his own or another's interest, an agent is subject to a duty not to act … contrary to the directions of the principal, even though the terms of the employment prescribe that such instructions shall not be given." RESTATEMENT (SECOND) OF AGENCY §385 (2). Therefore, Plaintiffs' have not only established a likelihood of success on the merits on their cause of action for Replevin, but they are entitled to Summary Judgment.

Plaintiffs have also established a likelihood of success on the merits on their cause of action for breach of contract and breach of fiduciary duty. Schwartz represented that he had the ability to arrange for galleries to handle Stephen's work and other commercial exhibits where Stephen's artwork could be sold. (Pace Aff.¶ 11).

The Consignment Agreement is fully consistent with the parties' understanding that Schwartz would sell the paintings in California and would do so through commercial exhibitions, which clearly meant gallery representation. (Pace Aff.¶ 12).

Rather than placing the work in galleries, Stephen's works were placed in Defendant's private office. (Plaintiffs' Ex. D pp.119) He did not place Stephen's artwork for "commercial exhibitions" anywhere on this planet until after this litigation was commenced. (Pace Aff. ¶18) He then placed a limited number of works in galleries in Maine, which competed with the galleries which Stephen himself had chosen to deal with in Maine. (Pace Aff. ¶18)

Schwartz has now admitted at his deposition that he never had any business relationship with any gallery in California prior to the time the Consignment Agreement was executed and he did not place Stephen's works in galleries for commercial exhibitions, as required by their agreement. (Plaintiffs' Ex. D. pp. 128-130)

Although Day introduced Schwartz to the Paces as someone who would place Stephen's artworks in galleries in California and on the west coast, Day was hoping to acquire the consigned paintings for himself, so that they would remain in Maine. (Plaintiffs' Ex. C pp.17-18, 20-21; Plaintiffs'. D. pp.254) Schwartz and Day's purpose for the second amendment was to permit Schwartz to provide Day with Stephen's paintings so that they could be displayed at Fryeburg Academy in Maine. (Plaintiffs' Ex. C pp. 126-128; Plaintiffs' Ex. D pp. 244-245, 252, 265)

These exhibits are not commercial exhibits as contemplated by the parties' Agreement, and have nothing to do with the sale of Stephen's paintings. They are merely another breach of that Agreement.

Day now has testified that he has received nine (9) of Stephen's paintings from Schwartz. Other than a trade of one painting to Schwartz, neither Schwartz, nor Day can recall what, if anything, Day paid for the paintings given to him by Schwartz. (Plaintiffs' Ex. C. pp 16-32; Plaintiffs' Ex. D. pp 250-251).

To add insult to injury, Schwartz then contacted a gallery to which Stephen had consigned other Pace artworks for sale. Schwartz represented himself as the owner of the paintings consigned to him and offered to trade certain of the artworks consigned to him for other Paintings, which were in the gallery in Maine. In other words, Schwartz offered to trade artwork which Stephen owns, in exchange for other artwork which Stephen owns. (Pace Aff. ¶30)

Schwartz e-mailed the owner of the gallery and suggested that she contact Stephen in an effort to lower the price that she could obtain Stephen's artworks for, so that she could in turn afford to trade his artwork for other artwork of his which was merely consigned to Schwartz. (Pace Aff. ¶31). He used the consigned paintings in order to attempt to obtain other artworks which he preferred to own, even if he would have Ms. Wilkes negotiate against Stephen to reduce their agreed prices so that Schwartz could receive the benefit of that transaction.

Schwartz also executed gift documents in connection with the donation of consigned paintings, listing himself as the "Donor" of these consigned paintings. (Plaintiffs' Ex. G). By listing himself as the "Donor" without disclosing that he was merely a consignee of the work, he attempted to portray himself as the owner of the artwork. Defendant received the prestige and goodwill accompanying the donation. Not only did Defendant list himself as the Donor of these artworks, he also designated that the painting was "Gifted in Honor of John M. Day". (Plaintiffs' Ex. G). He then failed to notify Plaintiffs of these donations for four (4) months. (Pace Aff. ¶28)

In light of the foregoing, Plaintiffs have established a likelihood of success on the merits, not only on their cause of action for Replevin, but also on their causes of action for breach of contract and breach of fiduciary duty.

C. The Balance Of The Hardships Heavily Tips In Favor Of Pace

As previously discussed, supra, there is simply no significant hardships to Schwartz while the potential injury to Pace is irreparable. Any hardship involved in Schwartz's retaining the paintings during the action is minimal. They are hanging (according to his testimony) in his office. (Plaintiffs' Ex. D. pp. 119) He does not even suffer storage charges! Schwartz has not progressed in efforts to sell the paintings – he in fact denies that he has any obligation to try to sell them or any other obligations with respect to them at all! (Plaintiffs' Ex. I) Thus a temporary delay in sales or disposition cannot meaningfully harm him, and even if it did, it would be an injury compensable in damages (if proven). All he can allege is the loss of money. Pace, however, would lose the product of his own creativity; would lose the ability to control part of his artistic legacy; and the loss of unique and irreplaceable works. Schwartz can always be compensated by money; however, once these artworks are dissipated, they can never be returned.

**POINT III**

**A TEMPORARY RESTRAINING ORDER IS REQUIRED TO PROTECT PLAINTIFFS**

Schwartz must be restrained promptly from continuing to transfer or dispose of the artwork. While his ability to effect sales has been nil, he has necessarily purported to transfer the artwork in violation of his agency to Day and to institutions on the East Coast for his personal aggrandizement. Unless this is stopped now, the paintings will continue to be dissipated.

This TRO application is being made simultaneously with the preliminary injunction application and several dispositive motions. It may prove to be the case that it will be unnecessary to entertain either a TRO or preliminary injunction, inasmuch as an order of replevin on the merits would accomplish essentially the same purpose. However, if the Court will need additional time to resolve the merits of the replevin and permanent injunction claims, or even the merits of the preliminary injunction application, it should nevertheless exercise its discretion to preserve the status quo during those deliberations by granting the TRO.

In applying for leave to file this application, Plaintiffs indicated to the Court, and reiterate that this application is being made at this time because Plaintiffs had previously believed that Schwartz was respecting an informal standstill request. However, during discovery and in particular, during the depositions of George Schwartz and John Day, it became clear that Schwartz was actively changing the status quo and necessitating this application. Thus, this application is timely.

## POINT IV

## LITTLE OR NO UNDERTAKING SHOULD BE REQUIRED

This Court should require little or no undertaking when granting Plaintiffs' motion for a preliminary injunction.

Defendant has claimed in his Memorandum of Law that Pace "is not a renowned artist in any sense of being widely acclaimed or highly honored" and that "Outside a limited circle of art collectors and galleries, he is unknown". (See Footnote 7 to Defendant's Motion for Summary Judgment)

Defendant has claimed that improving his stature would be a long process which would take many years (Plaintiffs' Exhibit D p.179)

Defendant admits that he has not yet implemented this process due to the cloud of title resulting from this litigation. (Plaintiffs' Ex. D p. 135)

During the entire time the paintings have been consigned to Schwartz, he has not sold any paintings, other than nine (9) paintings which were "traded" to John Day and one to an investment group under Schwartz's direction. (Plaintiffs' Ex. D. pp 250-254, 310). Neither Schwartz, nor Day can recall what, if anything, Schwartz was given by Day in exchange for the paintings. (Plaintiffs' Ex. C. pp 16-32; Plaintiffs' Ex. D. pp 250-256).

Defendant is "hoisted by his own petard". Having argued that Pace has low stature in the art world, and that the process of increasing his stature has yet been not undertaken, Schwartz cannot now claim that he would be damaged by any injunction. He cannot claim that he will lose any prospective sales revenues, since he admits he has not, and cannot make any sales at this time.

In light of the foregoing, no bond should be required. A district court may dispense with security for a grant of preliminary injunction. Doctor's Associates, Inc. v. Distajo, 107 F.3d 126 (2d Cir. 1997); International Controls Corp. v. Vesco, 490 F.2d 1334 (2nd Cir. 1974)

At the very least, any undertaking should be minimal since there is no possible harm to Defendant.

As set forth above and more fully in Plaintiffs' motion for summary judgment, Plaintiffs have an absolute right to terminate the agency relationship with Schwartz. Canadian Imp. Co. V. Cooper, 161 F. 279, 88 C.C.A. 325 (2d Cir. 1908); Sibbald v. Bethlehem Iron Co., 83 N.Y. 378

(2d Cir. 1881).  See also, G.K. Alan Assoc., Inc. v. Lazzari, 44 A.D.3d 95, 840 N.Y.S.2d 378, 2007 N.Y. Slip Op. 06019 (2d Dept. 2007.)

Since that agency has been terminated, Schwartz has an obligation to immediately return the consigned paintings. Echomail, Inc. v. American Express, 445 F.Supp.2d 87 (D.Mass 2006)

Since Defendant no longer has any authority or legal right to dispose of any of the paintings, and has an obligation to return the paintings, an injunction, enjoining Schwartz from disposing of the paintings could not possibly cause Schwartz any harm.

In LaForest v. Former Clean Air Holding Co., Inc. 376 F.3d 48 (2d Cir. 2004), the Second Circuit held that a "[s]ecurity bond was not required in connection with preliminary injunction" because "complying with an obligation could not constitute harm… much less the sort that would require protective measure of bond"

Based upon the foregoing, this Court should require little or no undertaking when granting Plaintiffs' motion for a preliminary injunction.

## CONCLUSION

For the foregoing reasons, Plaintiffs motion should be granted in its entirety together with such other and further relief as this Court deems just and proper.

Dated: October 27, 2009
      New York, New York

MALCOLM S. TAUB LLP
*Attorneys for Plaintiffs*

By:_____
     Malcolm S. Taub (MT-5294)
110 East 59th Street, 25th Floor
New York, NY 10022
(212) 265-8600
(212) 581-8958 Fax

SUPREME COURT OF THE STATE OF NEW YORK

COUNTY OF NEW YORK: IAS PART 49

-----------------------------------------------------------------X

AL HIRSCHFELD,


Plaintiff,


-against-

Index No.602067/00

THE MARGO FEIDEN GALLERIES LTD.,

MARGO FEIDEN, and THE MARGO FEIDEN

GALLERIES,


Defendants.

-----------------------------------------------------------------X

**HERMAN CAHN, J.:**

This action is between a well known artist, plaintiff Al Hirschfeld and the gallery which has represented him for more than a quarter of a century, and the owner of the gallery, defendants. Hirschfeld seeks a preliminary injunction (1) directing the seizure of artwork he consigned to defendants The Margo Feiden Galleries Ltd., Margo Feiden, and The Margo Feiden Galleries (collectively, "Feiden"); (2) directing Feiden to provide a full and complete inventory of all of Hirschfeld's consigned artwork in Feiden's possession; and (3) directing Feiden to provide a full accounting of the sale or other disposition of Hirschfeld's work from January 1, 1997 to the present. Feiden cross-moves for a preliminary injunction restraining Hirschfeld from (1) accepting assignments for commissioned portraits other than from or through Feiden; (2) refusing to complete accepted assignments arranged by Feiden prior to May 15, 2000; (3) denying Feiden access to original drawings which Hirschfeld intends to offer for sale; and (4) offering for sale or selling original drawings other than through Feiden during the pendency of this action.

## Background

Hirschfeld is a renowned caricaturist whose pictures, chronicling people in the theater and arts, have appeared in numerous publications since the 1920's. Hirschfeld, now 97 years of age, has also sold pictures in private sales for approximately seventy years. Since the early 1970's, Hirschfeld consigned

works of art to Feiden. A formal agreement was entered between the parties on February 14, 1974. Feiden, according to Hirschfeld, now holds 1,000 to 1,200 pieces of his work on consignment.

Under the terms of the 1974 agreement, Hirschfeld consigned to Feiden all his original works of art and upon Feiden's sale of a Hirschfeld work, Hirschfeld received a mutually agreed-upon payment. The agreement provided that all sales of drawings for which arrangements were made with the prospective purchaser before Hirschfeld created the work of art would be made through Feiden. Feiden was granted exclusive reproduction rights to Hirschfeld's artwork during the term of the agreement.

The agreement further guaranteed Hirschfeld a minimum payment of $10,000 each year. It further provided that its term would automatically be extended year by year if Hirschfeld received payments of at least $12,000 during the preceding twelve month period. Feiden was given the option of terminating the agreement unilaterally; Hirschfeld was not.

Although the arrangement between Hirschfeld and Feiden was apparently beneficial to both of them for more than two decades, resulting in increased recognition and sales for both artist and gallery, their relationship has recently soured. Hirschfeld alleges that since 1997, Feiden violated her responsibilities as consignee of his work by refusing to follow his instructions regarding its disposition, refusing to return his work when requested to do so, and wrongfully preventing exhibition of his work, for her personal reasons. Hirschfeld maintains that, for example, in 1997 Feiden attempted to block a retrospective exhibition of his work in Katonah, New York, and that more recently Feiden blocked a retrospective at the Academy of Motion Picture Arts and Sciences in Hollywood, due to her personal animosity toward an individual involved in the exhibition. Hirschfeld further contends that Feiden (1) refused to follow his instructions regarding the disposition of his work and threatened that he would spend the remainder of his life in court if he attempted to recover his work from her; (2) refused to provide him with copies of documentation and records concerning his work; and (3) violated her responsibilities as his agent and consignee of his artwork. Hirschfeld maintains that the 1974 agreement is unconscionable and contrary to industry practice.

Hirschfeld contacted Feiden in January 2000, requesting amendment of the 1974 agreement and stating that unless such changes were accepted, their relationship would be terminated as of March 1, 2000. Feiden rejected Hirschfeld's demands by letter dated February 11, 2000. Hirschfeld formally terminated his relationship with Feiden on May 15, 2000. The following day, this action was initiated.

The complaint contains nine causes of action: (1) recovery of consigned property; (2) conversion; (3) breach of fiduciary duty; (4) breach of contract; (5) interference with prospective economic relations; (6) intentional infliction of emotional distress; (7) accounting; (8) declaratory judgment; and (9) preliminary injunction enjoining Feiden from disposing of Hirschfeld's consigned work without his consent.

This Court issued a temporary restraining order, restraining Feiden from disposing of any of Hirschfeld's consigned artwork other than in the ordinary course of business and from selling or disposing of any of Hirschfeld's artwork to Feiden, pending decision of this motion. The TRO is continued until the order is entered herein.

In opposing Hirschfeld's demand for a preliminary injunction, Feiden asserts that Hirschfeld "has fallen under the influence of third parties who wish to benefit financially from his work," endangering Hirschfeld's reputation and Feiden's clients. Feiden Aff., at ¶ 4. Feiden contends that Hirschfeld has breached the 1974 agreement by selling or otherwise disposing of a substantial number of his works without Feiden's consent, accepting commissions without Feiden's involvement, and licensing to third parties the right to reproduce some of his work.

Feiden contends that the purpose of a preliminary injunction is to maintain the status quo, and that Hirschfeld seeks by the instant motion to alter the parties' relationship. Unless a preliminary injunction is issued in favor of Feiden, it is asserted, Feiden will suffer irreparable injury, as the gallery's business will be destroyed. It is also claimed by Feiden that Hirschfeld ratified the 1974 agreement in 1996, thus rendering his argument that the agreement is unconscionable, meritless.

### Discussion

A preliminary injunction may be granted if the party shows a likelihood of success on the merits, the potential for irreparable harm if the injunction is not granted, and a balance of equities in its favor. Aetna Ins. Co. v Capasso, 75 NY2d 860, 862 (1990); W.T. Grant Co. v Srogi, 52 NY2d 496, 517 (1981). It is not required for a party seeking a preliminary injunction to establish that its success in the litigation is certain. Rather, a prima facie showing of a likelihood of success on the merits and irreparable injury is sufficient. Props for Today, Inc. v Kaplan, 163 AD2d 177, 178 (1st Dept 1990); Akos Realty Corp. v Vandemark, 157 AD2d 632, 634 (1st Dept 1990). The moving party bears the burden of proof on such a motion, Titus & Donnelly, Inc. v Poto, 205 AD2d 475, 475 (1st Dept 1994), and it must do so by "affidavit and other competent proof, with evidentiary detail." Faberge Intl., Inc. v Di Pino, 109 AD2d 235, 240 (1st Dept 1985). "If key facts are in dispute, the relief will be denied." Scotto v Mei, 219 AD2d 181, 182 (1st Dept 1996).

### A. Irreparable Harm

Generally, when money damages can provide an adequate remedy for the claimed wrong, no irreparable harm is present. Schleissner v 325 West 45 Equities Group, 210 AD2d 13, 14 (1st Dept 1994). See, also, Fox v Wiener Laces, Inc., 74 AD2d 549, 549 (1st Dept 1980). Here, however, as acknowledged by Feiden, Hirschfeld's "consigned artwork is unique and valuable." Feiden Aff., Exh. M, Answer and Counterclaims, at ¶ 16. In fact, courts have recognized the unique nature of works of art. Staff v Hemingway, 47 AD2d 709, 710 (4th Dept 1975) (painting is unique); Kinderhill Select Bloodstock, Inc. v United States, 835 FSupp 699, 700 (NDNY 1993) (New York state courts have found works of art to be unique). Hirschfeld seeks the return of his work that is now in the possession of Feiden. Since money damages would not themselves be an adequate remedy for the loss of unique artwork, Hirschfeld has established irreparable harm. However, since the return of the artwork is the ultimate remedy sought in the action, and since a trial is imminent, a less drastic remedy than sought (by Hirschfeld) will be granted. Feiden is restrained from disposing of any of the consigned works of art pending the trial of the action. CPLR 7109 specifically permits the granting of a preliminary injunction prohibiting the transfer, sale, or assignment of unique chattel, which Hirschfeld's artwork clearly is.

Feiden argues that the gallery will suffer irreparable harm should Hirschfeld's preliminary injunction be granted, as the gallery will be forced to go out of business. The Court declines to accept this argument, as nothing is to prevent Feiden from continuing its business in the sale of artwork produced by other artists. Further, the period of the restraint is relatively short in view of the imminence of the trial.

### B. Likelihood of Success on the Merits

The Arts and Cultural Affairs Law provides that notwithstanding any agreement to the contrary, whenever an artist delivers a work of fine art to an art merchant for the purpose of a sale, a consignor/consignee relationship is established. Arts and Cultural Affairs Law § 12.01(1)(a). The statute

further provides that the consignee is "deemed to be the agent" of the consignor and that the work is trust property for the benefit of the consignor. Id., at § 12.01(1)(a)(i), (ii).

Despite the plain language of the statute, Feiden continuously asserts that § 12.01 does not create an agency relationship. The fact that Feiden denies the existence of an agent/principal relationship adds little to the defense to Hirschfeld's claim of breach of fiduciary duty.

As an agent of Hirschfeld, Feiden is bound to act in accordance with Hirschfeld's reasonable instructions concerning his work. Pensee Assocs., Ltd. v Quon Industries, Ltd., 241 AD2d 354, 359 (1st Dept 1997) ("Agency is a fiduciary relationship created as a result of conduct by parties manifesting that the principal party is willing to allow the other party, upon such other party's consent, to act for it subject to the principal's control and within the limits of the authority thus conferred."). Moreover, "[a]n agent is held to the utmost good faith in his dealings with his principal, and forfeits any right to compensation for his services if he acts adversely to his employer 'in any part of the transaction.'" Soam Corp. v Trane Co., 202 AD2d 162, 163 (1st Dept 1994) (quoting Beatty v Guggenheim Exploration Co., 223 NY 294, 304 [1918]).

Hirschfeld has submitted evidence suggesting that Feiden was not acting in his best interests on a number of occasions. Specifically, it is alleged that Feiden, sought to block two exhibitions of his work. Affidavits to the Court support this contention. See, Jacobson Aff., at ¶ 8 (counsel of Katonah Museum of Art stating that "Feiden was threatening to withhold her cooperation with the exhibition, and impliedly threatening a lawsuit in the event that [Hirschfeld's chosen curator] continued to be involved."). In fact, Feiden herself acknowledges that she was willing to assist the Academy of Motion Picture Arts and Sciences only on a conditional basis, despite the fact that Hirschfeld wanted the exhibition to go forward. See, Feiden Aff., at ¶ 68 ("The Academy knew that I was willing to assist in any way possible should they decide to do the exhibition employing a different curator."). Thus, it is clear that Hirschfeld has made a showing of a likelihood of success on this claim.

Feiden also argues that the Arts and Cultural Affairs Law does not replace a valid and binding consignment agreement between artists and dealers. However, the plain language of the statute indicates that notwithstanding the 1974 agreement, Feiden is a consignee of the artworks, and they are trust property. Arts and Cultural Affairs Law § 12.01(1)(a)(ii). In fact, several courts have reached identical conclusions. See, Wesselmann v International Images, Inc., 259 AD2d 448, 449 (1st Dept 1999); Zucker v Hirschl & Adler Galleries, Inc., 170 Misc2d 426, 433 (Sup Ct, NY County 1996).

Hirschfeld has established a likelihood of success on his claim for an accounting. See, Wesselmann, supra, at 449 .

The Court notes that the parties have submitted affidavits from experts who strongly disagree as to a number of issues, including the propriety of the commission rates in the 1974 agreement and whether the lack of insurance coverage by Feiden for the consigned artwork in the gallery is appropriate. However, these issues and others need not be determined at this juncture.

In asserting that Feiden has shown a likelihood of success, Feiden argues that the 1974 agreement prohibits Hirschfeld from disposing of his works of art without Feiden's consent and accepting commissions without Feiden's involvement. Feiden, however, has not shown a likelihood of success on this claim, as it appears that the agreement at issue may be found to be unconscionable. An unconscionable contract is one which "'is so grossly unreasonable or unconscionable in the light of the mores and business practices of the time and place as to be unenforceable according to its literal terms.'" Gillman v Chase Manhattan Bank, N.A., 73 NY2d 1, 10 (1988) (quoting Mandel v Liebman, 303 NY

88, 94 [1951]).

The 1974 agreement binds Hirschfeld to consign to Feiden all the original works of art produced by him during its term. Agreement, ¶ 1. It appears to be difficult in a practical way for Hirschfeld to terminate the agreement if he wishes to do so, while it is relatively simple for Feiden to terminate it. This imbalance could be argued to constitute unconscionability. However, the court need not resolve this issue on this motion, but leaves it to trial.

Because the Court concludes that Feiden has failed to show a likelihood of success on the merits, the cross motion for a preliminary injunction prohibiting Hirschfeld from accepting assignments for commissioned portraits other than through Feiden, denying Feiden access to original drawings, and offering for sale or selling original drawings other than through Feiden during the pendency of this action, is denied. In any event, any damage suffered by Feiden on account of Hirschfeld's actions in this connection are damages which can be easily recompensable by money. As Hirschfeld has agreed to complete accepted assignments arranged by Feiden prior to May 15, 2000, see, Hirschfeld Reply Aff., Exh. C, May 18, 2000 Letter, that portion of Feiden's motion seeking to enjoin Hirschfeld from completing such assignments is moot.

## C. Balance of Equities

The balance of equities tips in Hirschfeld's favor, as works of art delivered to an art merchant are trust property for the benefit of the artist. Arts and Cultural Affairs Law § 12.01(1)(a)(ii).

Finally, it is clear that Hirschfeld is entitled to a full and complete inventory of all his consigned works of art in Feiden's possession, and a full accounting of the sale and other disposition of his works of art by Feiden from 1997 to the present. Said accounting should include a description of the work of art disposed of, the date of disposition, the consideration agreed upon and actually received, when received, the name and address of the purchaser of the work, and when actually delivered to the purchaser. Backing documents should be available for inspection. The above inventory and accounting should be served on Hirschfeld's attorney on or before August 18, 2000.

Further, it is important that Feiden immediately obtain appropriate insurance including but not limited to fire and theft, covering these works of art. Feiden is ordered to immediately obtain such a policy with loss limits of at least $2,000,000, naming Hirschfeld as an additional insured, on or before July 27, 2000.

### Conclusion

Trial is scheduled for September 5, 2000.

Settle Order on 48 hours notice.

Dated: July , 2000 ENTER: _____

J.S.C.